UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| SUSIE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:18-CV-00235-AGF |
| | ) | |
| RENAL CARE GROUP, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the motion (ECF No. 24) for summary judgment filed by the only remaining Defendant in this case, Renal Care Group, Inc. ("Renal Care"), with respect to Plaintiff Susie Smith's claims asserting sexual harassment, gender discrimination, and retaliation in violation of the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. §§ 213.010-213.137. For the reasons set forth below, the Court will grant Renal Care's motion.

## BACKGROUND

For the purpose of the motion before the Court, the record establishes the following facts.[1] Smith was employed by Renal Care from April 2014 until she resigned

---

[1] Smith did not attach exhibits or affidavits to her unsworn response to Renal Care's statement of uncontroverted material facts or to her own unsworn statement of additional uncontroverted material facts; rather, she relied on the exhibits attached to Renal Care's statement. However, Renal Care's exhibits included only excerpts of certain deposition transcripts. To the extent that Smith's statements of facts relies on portions of deposition transcripts or other evidence that is not included in Renal Care's exhibits or elsewhere in the record, the Court will disregard such statements as unsupported by the record. *See Sayles v. Saint Louis Univ.*, No. 4:18 CV 743 CDP, 2019 WL 1773186, at *2 (E.D. Mo.

2

on October 2, 2017. Renal Care first hired Smith as a charge nurse, but prior to Smith's start date, Renal Care offered Smith the job of clinic manager, which Smith accepted. Smith worked as clinic manager at Renal Care's dialysis center in Kennett, Missouri throughout her employment.

Renal Care has a progressive discipline policy that begins with verbal counseling, followed by written counseling, a written warning, a final written warning, suspension, and termination. Although the policy is generally followed by managers, it is implemented on a case-by-case basis, and several steps may be skipped based on the severity and egregiousness of the infraction. ECF No. 26-20 at 41:10-19.

When Smith started work for Renal Care, her supervisor was Janet Gaines. In March of 2016, Gaines conducted a performance review of Smith's work in which she checked boxes to indicate that Smith's overall rating was a three out of five, translating to work at a "commendable" level.[2] ECF No. 26-3. Although Gaines rated Smith three out of five in each category of performance, Gaines also indicated in handwritten comments areas in which Smith was performing well and areas in which she was working to improve, such as "learning how to maintain regulatory compliance," "working on building an effective team and relationships with the physicians," and "learning how to

---

Apr. 23, 2019) ("[B]ecause a party cannot rely on unsworn/unattested declarations or statements to support or oppose a motion for summary judgment, I do not consider the unsupported factual averments made in [the plaintiff's] unsworn response to the [defendant's] motion.") (citing *Banks v. Deere*, 829 F.3d 661, 667-68 (8th Cir. 2016)).

[2] The rating scale was as follows: "1 Exceptional," "2 Superior," "3 Commendable," "4 Needs Improvement," and "5 Unsatisfactory." ECF No. 26-3.

be an effective problem solver." *Id.* Gaines further commented as follows: "Quality outcomes need improvements," and "[f]inancial acumen needs improvement. Supply cost are [sic] high. TAP is high."[3] *Id.*

In her deposition taken in this case, Gaines testified that she believed Smith was competent, and that she did not recall ever recommending that disciplinary action be taken against Smith. ECF No. 26-4 at 72:22-73:1, 67: 15-17. However, Gaines further testified that, a couple months after completing her 2016 evaluation of Smith, she (Gaines) spoke to her own supervisor and to Tara Walker, who would later become Smith's supervisor, about the possibility of putting Smith on a performance improvement plan. *Id.* at 67: 17-23, 76:7-23. Gaines ultimately decided against such action, believing that it would be too much of a burden on Smith. *Id.* at 67: 17-23/

On August 28, 2016, Gaines transitioned to a different position, and Walker became Smith's supervisor. In January of 2017, Smith completed a self-evaluation of her work performance over the prior year and submitted the evaluation to Walker. On February 27, 2017, Walker reviewed and edited Smith's self-evaluation so that the document would reflect Walker's evaluation of Smith's work. However, Walker did not share or discuss her edits with Smith at any time before Smith filed this lawsuit. In her handwritten edits, Walker indicated that Smith needed improvement or was

---

[3] TAP refers to "total area productivity" and "is calculated by dividing the total number of patient treatments at a clinic by the total number of employee hours worked during the same time period. All managers are required to ensure their clinics meet a TAP goal of 2.85." ECF No. 26 at 2 n.3.

unsatisfactory in all categories of performance, specifically noting, for example, that Smith's "facility [was] struggling with Quality, TAP, missed treatments." ECF No. 26-6.

On March 14, 2017, Smith attended a clinic managers' meeting where a female manager used profane language such as "motherfucker," "son of a bitch," and "fuck," in an angry rant that continued throughout the daylong meeting at which both male and female employees were present. The manager did not direct these comments to Smith individually, but the language made Smith feel uncomfortable.

On March 21, 2017, Smith complained to Walker about the language used at the meeting, stating that the language made Smith uncomfortable. Walker apologized for the manager's language and stated that she would take care of it.

As clinic manager, one of Smith's duties was to approve employee timecards for payroll. On March 30, 2017, Walker received a report that Smith gave her company log-in information to another employee so that the employee could approve timecards for Smith. Walker reported Smith's conduct to Renal Care's human resources department as a violation of company policy. Smith disputes that she violated company policy.

By late March and early April 2017, Walker had also received staff complaints that Smith showed favoritism to a patient care technician, Brittany Lynch, who was the daughter of one of Smith's friends. Smith has denied showing any such favoritism.

On April 5, 2017, Walker received a patient complaint that Smith was unable to accommodate the patient for treatment on a weekend, and Walker reported the complaint to Renal Care. The next day, a separate incident occurred in which Walker accused Smith of allowing Lynch to use an open syringe on a patient, in violation of Renal Care's

5

patient safety policy. Smith denied having seen Lynch improperly using any syringe. Walker then contacted Serge Ceralde of Renal Care's employee relations department to inquire about giving Smith a corrective action regarding her back-to-back policy violations and performance issues. After consulting with Ceralde and Renal Care's regional vice president, Pat Komoroski, Walker decided to give Smith a final written warning for the policy violations while placing her on a performance improvement plan. In her deposition taken in this case, Walker testified that she decided to skip some steps of Renal Care's progressive discipline policy because of the frequency and severity of Smith's policy violations.

On April 14, 2017, Walker informed Smith that Smith was being suspended while Walker and Komoroski investigated the syringe incident. On April 17, 2017, Walker and Komoroski informed Smith that, due to her poor work performance, she would have the option of stepping down or accepting a 90-day performance improvement plan. The next day, Smith contacted Walker and stated that she would accept a performance improvement plan. Walker responded that the time period for improvement had not been finalized and may change to 30 days instead of 90 days. Walker thereafter contacted Smith on a weekly basis to address Smith's performance and areas for improvement.

On April 19, 2017, Smith attended a clinic managers' meeting where male and female employees were present. During the meeting, a male manager licked food off of his mustache and beard while eating lunch, prompting another female employee to make a remark alluding to the manager's ability to perform oral sex. Although the remark was not directed to Smith, it made Smith feel uncomfortable. Walker was present at the

6

meeting,[4] but Smith did not complain about the language to Walker or report that she felt uncomfortable.

On April 19, 2017, shortly after the above-described meeting, Walker presented Smith with a formal 30-day performance improvement plan and final written warning. The performance improvement plan gave Smith 30 days to achieve certain desired metrics with respect to missed treatments, TAP, "SIMS,"[5] "LMS training,"[6] scheduling, and documentation. ECF No. 26-12.

The final written warning listed as reasons for corrective action the alleged policy violations described above regarding Smith's sharing of her log-in with another employee and failing to stop Lynch from using an open syringe on a patient. ECF No. 26-11. The document further stated that Smith was failing to perform her job in a satisfactory manner and that she needed improvement "in a number of significant clinic metrics, such as TAP, SIM's completion, missed treatments, quality, and scheduling." *Id.* Both the performance improvement plan and final written warning cautioned that failure to meet expectations may result in further action, including termination of employment.

---

[4] Walker testified that, after hearing the comment, she told the employees to "knock it off," but Smith disputes this assertion.

[5] SIMS refers to a computer program with assigned tasks for clinic managers to complete within a specified time frame; the tasks relate to a variety of topics, such as new policies, company initiatives, completion of regulatory requirements, ordering of uniforms, and staff training.

[6] LMS training refers to certain mandatory computer training on skills, policies and procedures that all managers and staff must complete. ECF No. 26 at 9 n.6.

Smith submitted a written response dated April 19, 2017, in which she disputed the allegations in the final written warning. Smith ultimately accepted the performance improvement plan, but the parties dispute whether Smith improved her performance. On May 5 and May 11, 2017, Walker contacted Ceralde and explained that Smith's performance issues were persisting and that, despite counseling and informal reminders from Walker, Smith had failed to improve. According to Smith, Walker frequently called Smith throughout this time in order to encourage her to resign and also added tasks to the performance improvement plan.

On May 11, 2017, Walker informed Ceralde that she was going to seek termination of Smith, and on May 15, 2017, Walker initiated Renal Care's formal process to seek to terminate Smith's employment. On May 15, 2017, Smith contacted Ceralde to complain that Walker was harassing her and creating a hostile work environment. Smith indicated that Walker was pressuring her to step down by assigning unattainable goals. Smith also complained of "sexual innuendo" being used at managers' meetings and stated that she had reported her discomfort with such language to Walker. ECF No. 26-14. This was the first time that Smith complained about the comments at the April 2017 managers' meeting. Ceralde investigated Smith's report and found that any profanity used at meetings was adequately addressed by Walker.

Before Renal Care made any decision regarding whether to terminate Smith, Smith requested and was approved for FMLA leave beginning on May 23, 2017. Smith's leave was extended multiple times, and she was scheduled to return to work on October 11, 2017. However, on October 2, 2017, Smith resigned. Smith asserts that her

resignation constituted a constructive discharge, and that she sustained emotional distress, lost wages, and lost benefits as a result.[7]

Smith asserts that two male clinic managers were "having trouble with" on LMS and TAP training, and that these two managers were not placed on performance improvement plans. In support of this assertion, Smith cites her own deposition testimony that, at the managers' meeting on April 19, 2017, Walker made a list on a white board of managers who were behind on certain LMS training, and that the list included two male clinic managers but not Smith. ECF No. 27 at 5. Smith also cites to a portion of Gaines's deposition testimony that is not included in the record. *Id.* However, in the portions of deposition testimony that are in the record, Gaines testified that one of the male clinic managers referenced by Smith did at times have difficulty with TAP but the other male manager did not. ECF No. 26-4 at 34:5-12.

Smith filed suit in state court on August 10, 2018, after filing an administrative charge of discrimination and receiving a notice of right to sue. She asserts three claims under the MHRA: (1) sexual harassment based on the comments made at the March and April 2017 managers' meetings; (2) gender discrimination based on alleged disparate treatment as compared to male clinic managers; and (3) retaliation as a result of her

---

[7] Weeks before resigning, Smith had applied for and accepted the position of director of nursing at a health center, where she worked from October 2, 2017 to the end of December, 2017, and where she earned almost as much she did at Renal Care. However, Smith resigned from the director of nursing position, and on January 2, 2018, accepted a non-managerial role as a surgery circulator at a different hospital, incurring a significant pay cut.

9

complaints about the March and April 2017 meetings. As part of her claims for gender discrimination and retaliation, Smith alleges that she was constructively discharged.

Renal Care removed the case to this Court on October 3, 2018, on the basis of diversity jurisdiction. Renal Care now seeks summary judgment, arguing that Smith has failed to establish a viable claim of sexual harassment, gender discrimination, or retaliation.[8] In opposition, Smith asserts that genuine issues of material fact preclude summary judgment on her claims.

## DISCUSSION

**Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he burden of demonstrating that there are no genuine issues of material fact rests on the moving party," and the court must view "the evidence and the inferences which reasonably may be drawn from the evidence in the light most favorable to the nonmoving party." *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015).

In opposing summary judgment, a plaintiff may not "simply point to allegations" in the complaint, *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004), or "rest on the hope of discrediting the movant's evidence at trial," *Matter of Citizens*

---

[8] Alternatively, Renal Care argues that it is entitled to at least partial summary judgment on Smith's claim for lost wages due to Smith's failure to mitigate damages by voluntarily resigning from a comparable position. Smith's opposition does not address this alternative argument.

*Loan and Sav. Co.*, 621 F.2d 911, 913 (8th Cir. 1980). Rather, the plaintiff "must identify and provide evidence of specific facts creating a triable controversy." *Howard*, 363 F.3d at 800 (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

**Sexual Harassment**

The MHRA prohibits employers from discriminating against an employee because of that employee's sex. Mo. Rev. Stat. § 213.055.1(1)(a). To survive summary judgment on a sexual harassment claim under the MHRA, a plaintiff must show that "(1) she is a member of a protected group; (2) she was subjected to unwelcome sexual harassment; (3) her gender was a contributing factor in the harassment; (4) a term, condition or privilege of her employment was affected by the harassment; and (5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." *Watson v. Heartland Health Labs., Inc.*, 790 F.3d 856, 861 (8th Cir. 2015) (citing *Hill v. Ford Motor Co.,* 277 S.W.3d 659, 666, 666 n. 6 (Mo. 2009)). "In deciding a case under the MHRA, appellate courts are guided by both Missouri law and federal employment discrimination caselaw that is consistent with Missouri law." *Id.* (citing *Daugherty v. City of Md. Heights,* 231 S.W.3d 814, 818 (Mo. 2007)).

As an initial matter, the Court finds that no reasonable fact-finder could conclude that the comments made at the March 2017 managers' meeting constituted unwelcome sexual harassment. The comments contained no apparent sexual connotation and were

11

not even directed to Smith. *See, e.g.*, *id.* at 862 n.3 (noting that actions that "lack a sexual or racial animus," including comments that "lack a sexual or racial component . . . cannot be said to constitute sexual or racial harassment"); *Henze v. City of Lee's Summit*, No. 09-00099-CV-W-DGK, 2010 WL 2545841, at *5 (W.D. Mo. June 21, 2010) (granting summary judgment on an MHRA sexual harassment claim where the plaintiff had "not alleged any instance in which any party used the word 'f* *k' in a sexual context, such as to refer to copulation," as opposed to a mere exclamation).

But more importantly, Smith has failed to demonstrate a genuine issue of material fact that her gender was a contributing factor in the comments at either the March or April 2017 meetings. The Supreme Court has "never held that workplace harassment is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Smith v. Hy-Vee, Inc.*, 622 F.3d 904, 907 (8th Cir. 2010) (citing *Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 80 (1998) and noting Missouri courts look to *Oncale* in deciding sexual harassment cases under the MHRA).

Viewing the facts in the light most favorable to Smith, there is simply no evidence that the comments made at the managers' meetings were based on Smith's sex. Rather, the comments were made by female co-workers in front of males and females alike, with no evidence of desire for or hostility toward Smith based on her sex. *See id.* at 908 (holding that there was no evidence an alleged harasser's behavior was based on sex where the harasser "exposed both men and women to the same behavior"); *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 965 (8th Cir. 1999) (holding the same where the alleged harasser "used profanity toward both male and female employees" and there was no

12

evidence that an offending comment "was aimed at [the plaintiff], let alone that it was made because of her sex"); *Barekman v. City of Republic*, 232 S.W.3d 675, 681 (Mo. Ct. App. 2007) ("The use of foul language in front of both men and women is not discrimination based on sex.").

Likewise, Smith has failed to demonstrate a genuine issue of material fact as to whether the comments affected a term, condition or privilege of her employment. "The standard for proving [this] element is demanding." *Watson*, 790 F.3d at 861 (interpreting Missouri law). It requires Smith to prove that the harassment alleged, viewed objectively by a reasonable person, was "so intimidating, offensive, or hostile that it poisoned the work environment, and that the workplace was permeated with discriminatory intimidation, ridicule, and insult." *Id.* at 861-62 (cleaned up and internal citations omitted).

The two isolated incidents involving, at best, crude language, simply cannot satisfy this standard. *See id.* (holding that conduct over a period of ten days that included a sexual touching, sexually degrading slurs, and a threat was not sufficiently pervasive to alter the term, conditions, or privilege of employment). To the extent Smith claims that the comments at the managers' meetings constituted a constructive discharge leading to her resignation approximately six months later, such a claim is likewise implausible. *See Cosby v. Steak N Shake*, 804 F.3d 1242, 1246 (8th Cir. 2015) (noting that constructive discharge under the MHRA "requires considerably more proof than an unpleasant and unprofessional environment").

Finally, Smith has not offered evidence that Renal Care failed to take prompt and remedial action after notice. To the contrary, Smith admits that Walker promptly apologized for and promised to address the comments at the March 2017 meeting. And Smith further admits that she did not complain about the April 2017 meeting until a month later and that Ceralde promptly investigated her complaint thereafter. Nor has Smith offered evidence, as opposed to speculation, that Ceralde's investigation was inadequate. For all of these reasons, Smith's sexual harassment claim cannot survive summary judgment.

**Gender Discrimination**

In order to prevail in a suit for gender discrimination under the MHRA, "a plaintiff must demonstrate that (1) he suffered an adverse employment action; (2) his sex was a contributing factor in that adverse action; and (3) he incurred damages as a direct result." *Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1032 (8th Cir. 2016) (citing *Daugherty,* 231 S.W.3d at 820). While the MHRA's "contributing factor" standard is "less rigorous than the 'motivating factor' standard employed in federal discrimination cases," *id.*, it still requires a showing that gender "contribut[ed] a share in" or "ha[d] a part in producing the effect" of the adverse action, *Lomax v. DaimlerChrysler Corp.,* 243 S.W.3d 474, 482 (Mo. Ct. App. 2007).

As evidence of the second element, Smith relies on Renal Care's alleged disparate treatment of two male clinic managers. Evidence of similarly situated employees "can give rise to a factual issue as to whether a discriminatory reason was a contributing factor to an employer's conduct." *Denn*, 816 F.3d at 1033 (interpreting Missouri law). Absent

14

such evidence, the employee must provide "some other evidence that would give rise to an inference of unlawful discrimination." *Lampley v. Mo. Comm'n on Human Rights*, 570 S.W.3d 16, 24 (Mo. 2019) (citation omitted).

"Employees are similarly situated if they are accused of similar conduct and are disciplined in different ways." *Denn*, 816 F.3d at 1034. Nothing in the record suggests that the two male clinic managers Smith has identified were accused of the same or similar deficiencies in performance as Smith. For example, Smith provides no evidence that the two male clinic managers she has identified were accused of violating company policies related to payroll, patient safety, or anything of the sort. Indeed, Smith has not even adequately supported her assertion that the two managers were as far or further behind as she was in their training requirements. *See, e.g.*, *id.* ("Because the record does not show that Denn and Ceniceros engaged in 'similar conduct,' Denn's argument that Heatherman did not discipline Ceniceros cannot give rise to a genuine issue of material fact as to whether CSL treated Denn less favorably than similarly situated female employees."). Nor has Smith provided any other evidence that would give rise to an inference of unlawful gender discrimination. Renal Care is thus entitled to summary judgment on Smith's gender discrimination claim.[9]

---

[9] Further, it is not at all clear that the performance improvement plan or final written warning could constitute an adverse action, when there is no evidence these actions reduced Smith's pay or hours, or changed her job duties. *See, e.g.*, *Watson*, 790 F.3d at 864 (holding that an employee was not adversely for the purpose of an MHRA claim by an employer's performance warnings and an extension of the employee's probationary period because the actions did not reduce her pay or hours, or change her job duties). And as to Smith's claim of constructive discharge, "the fact that an employee is disciplined in accordance with an employment policy is not enough to prove a constructive discharge

15

**Retaliation**

"To establish a prima facie case of retaliation under the MHRA, a plaintiff must prove (1) he complained of discrimination; (2) the employer took adverse action against him; and (3) a causal relationship existed between the complaint and the adverse action." *Id.* at 1036 (citing *McCrainey v. Kansas City Mo. Sch. Dist.,* 337 S.W.3d 746, 753 (Mo. Ct. App. 2011)). A "causal relationship" exists under the MHRA "when retaliation was a contributing factor to the adverse action." *Id.* (citations omitted).

Smith has failed to demonstrate a genuine issue of material fact with respect to her claim of retaliation as a result of her complaints about the March and April 2017 meetings. Although Smith immediately complained about the comments made at the March 2017 meeting,[10] that complaint could not constitute a complaint of sexual harassment or discrimination because, as noted above, neither the comments nor Smith's complaint contained any references to sex, as opposed to general profanity. *See Peterson v. Ree's Contract Serv., Inc.*, No. 07-0550-CV-W-SOW, 2008 WL 11337608, at *4 (W.D. Mo. July 21, 2008) (holding that a plaintiff's complaints about "certain comments made by two of her co-workers as well as the fact that they engaged in 'horseplay,'" without any reference to sexual harassment, did "not qualify as a protected activity" for the purpose a Title VII retaliation claim).

---

claim under the MHRA," which requires working conditions that a reasonable person would find intolerable. *Cosby*, 804 F.3d at 1246.

[10] Smith admittedly did not complain about the comments at the April 2017 meeting until she contacted Ceralde on May 15, 2017.

16

Even if it could, and even further considering Smith's May 15, 2017 complaint to Ceralde about the sexual innuendo at the April 2017 managers' meeting, no reasonable fact-finder could conclude on this record that a causal relationship existed between either of Smith's complaints and Renal Care's decision to issue the performance improvement plan and final written warning.[11] Smith's primary argument in support of a causal relationship is based on timing, namely, that "[w]ithin a few days of complaining about the first incident of harassment and hostile work environment, [she] was accused of two major infractions, suspended, and placed on a performance improvement plan." ECF No. 28 at 13-14. "In order to survive summary judgment on a retaliation claim, however, a plaintiff generally must present *more than a temporal connection* between protected activity and an adverse employment action." *Denn*, 816 F.3d at 1036 (emphasis in original).

Smith presents no evidence that her reporting of feeling uncomfortable at the March 2017 meeting contributed to her being issued the performance improvement plan and final written warning. Rather, the record shows that Smith received the improvement plan and warning as a result of reported policy violations, as well as issues with quality and TAP dating back to March of 2016. *See id.* ("[A]lthough Denn received his final written warning shortly after he complained to human resources, Heatherman had sought approval to deliver this warning nearly a month before Denn's complaint, and her request cited performance issues dating back to February 2012."). And Smith's second

---

[11] Nor, as indicated above, is it clear that these actions constitute adverse employment actions or could support a constructive discharge claim.

complaint on May 15, 2017 was made nearly a month *after* Renal Care issued Smith a performance improvement plan and final written warning, and several days after Walker expressed a desire to terminate Smith's employment, thus refuting any causal relationship to the complaint as a matter of law. Smith's retaliation claim fails as a matter of law.

## **CONCLUSION**

For the reasons stated above, the Court will grant Renal Care's motion for summary judgment without reaching Renal Care's alternative argument, based on Smith's failure to mitigate damages.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is **GRANTED**. ECF No. 24.

All claims against all parties having been resolved, a separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 7th day of February, 2020.